This appeal is from a judgment on a jury verdict for the plaintiff in his action for malicious prosecution and the tort of outrageous conduct. The jury awarded Stephen Cofield, a former employee of the Alabama Department of Industrial Relations ("DIR"), $50,000 against Don Lumpkin, an investigator with DIR, and $125,000 against William R. Heatherly, formerly the director of DIR and currently the assistant director of DIR. Lumpkin and Heatherly raise numerous issues, including whether they were immune from suit, whether the proof met the elements of the causes of action, whether the trial court erred in admitting certain evidence, and whether the verdict and judgment improperly apportioned damages.
The basis of the malicious prosecution claim is Cofield's trial and acquittal under a criminal charge for violating the Alabama *Page 64 
Code of Ethics, Ala. Code 1975, § 36-25-1 et seq. A Jefferson County grand jury returned an indictment on June 7, 1985, charging Cofield with unlawfully using his official position to obtain direct personal gain by "accepting from James O. Driggers, payment for motel lodging at Angelyn, Winfield, Alabama, in the amount of $840.00, on or about December 17, 1981, while the said James O. Driggers was foreman at a mining site under inspection by the said Steve Cofield, in violation of Section 36-25-5 of the Code of Alabama, 1975." In September 1986, Cofield was tried before a jury, which found him not guilty.
An action for malicious prosecution requires the plaintiff to prove that the defendant instigated, without probable cause and with malice, a prior judicial proceeding against the plaintiff, that the prior proceeding ended in favor of the plaintiff, and that the plaintiff suffered damages. Alabama Power Co. v.Neighbors, 402 So.2d 958 (Ala. 1981). A grand jury indictment is prima facie evidence of probable cause. Id. Such a prima facie defense can be overcome by a showing that the indictment was "induced by fraud, subornation, suppression of testimony, or other like misconduct of the party seeking the indictment."National Security Fire Casualty Co. v. Bowen, 447 So.2d 133,140 (Ala. 1983).
The tort of outrageous conduct was recognized in AmericanRoad Service Co. v. Inmon, 394 So.2d 361 (Ala. 1980). The Inmon
Court said:
 "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. . . . By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."
Id., at 365.
From January 1980 until December 1984, Cofield was a land reclamation inspector for the Abandoned Mine Land Program ("AML") of DIR. The Office of Surface Mining ("OSM") of the Department of the Interior monitors AML's implementation of mine reclamation regulations. In August 1984, Cofield went to the OSM office in Birmingham and told OSM investigators that his superiors at AML had ordered him to falsify reports to show that the reclamation projects he inspected had been completed according to specifications, when in fact he had noted significant problems in his initial reports. Cofield also stated that such deviations between reports and actual conditions were common and that other problems existed at AML. On August 17, Cofield signed a statement reciting the information he had given OSM.
John Davis, the director of the Birmingham OSM office, sent OSM employees to reclamation sites and verified Cofield's information about discrepancies. Davis then informed Heatherly that problems existed at AML. Several days later, Heatherly telephoned Cofield; Cofield's testimony about that conversation was:
 "A. He said, 'I've heard you gave a statement to the Office of Surface Mining, and I wish you would come talk to our people in Montgomery.'
"Q. And what did you respond to him?
 "A. I responded to him that I had already tried to talk to the State people, and had reservations about talking to them.
"Q. Okay, and what did he say?
 "A. He assured me if I came to Montgomery, and cooperated and told the truth, that I would not have anything to worry about."
On August 24, 1984, Cofield went to DIR headquarters in Montgomery, where he gave a statement to Lumpkin, essentially repeating the information he had given to OSM. However, the investigation later turned toward alleged wrongdoings by Cofield. On September 24, 1984, Cofield's superiors sent him to Montgomery, where Lumpkin questioned him intensively for several hours, first without a stenographer present and then with a stenographer. The *Page 65 
recorded questioning focused exclusively on Cofield's actions while at AML.
Lumpkin asked Cofield about the payment for the motel room in Winfield. Cofield answered that when he learned that the contractor's foreman had paid for the room, he paid the motel clerk, Elbert Parsons, for the room and told Parsons to reimburse the foreman. Lumpkin did not ask Cofield how Parsons could be found. Without knowing Parsons's name, Lumpkin had previously asked the manager of the motel about this incident, but the manager had refused to answer questions, referring Lumpkin to his lawyer. After learning Parsons's name, Lumpkin telephoned the "Parsons" listings in the 1984 Winfield telephone book, but none of the persons listed knew Elbert Parsons. Lumpkin next looked at DIR employment records for the corporation that owned the motel. Those records showed five persons, not including Parsons, employed for the quarter ending September 30, 1981, but no workers employed for the period in question, the quarter ending December 31, 1981.
In spite of making no further attempts to locate Parsons, Lumpkin told the general counsel for DIR that Parsons could not be found. Also, Lumpkin later told the assistant district attorney in charge of the case that Parsons could not be found. At trial, Cofield produced Parsons as a witness, and Parsons corroborated Cofield's version of the events.
On December 14, 1984, Lumpkin swore out a warrant for Cofield's arrest, and Cofield was placed on administrative leave from AML. Lumpkin testified before a grand jury, which returned an indictment. The case was assigned to an assistant district attorney who, after reviewing the file, recommended to George Cocoris, general counsel for DIR, that the case be dismissed. Cocoris relayed this recommendation to Heatherly, and there was evidence that Cocoris suggested deferring to the prosecutor's judgment. There was evidence that Heatherly would not accept the prosecutor's recommendation that the case be dismissed. There was also evidence that Cofield's attorney and Cocoris agreed that, if Cofield resigned, DIR would not stand in the way of any agreement between Cofield and the district attorney's office. Cofield resigned, but there was evidence that Heatherly insisted that the case be prosecuted to the fullest extent.
This and other evidence presented a jury question on the claims of malicious prosecution. The jury could permissibly have inferred that Lumpkin made inadequate efforts to locate Parsons, Cofield's exculpatory witness, and then concealed the fact of his cursory search from the assistant district attorney and Cocoris. Such a finding would have rebutted the presumption of probable cause, on the theory that Lumpkin, in effect, had suppressed the testimony of Parsons. Similarly, there was evidence to support the claim against Heatherly, including the evidence that he refused to follow the prosecutor's recommendation that the case be dismissed. Without setting forth the other evidence in detail, we hold that the trial court did not err in submitting the malicious prosecution claims to the jury.
The claim for the tort of outrage is not supported against either defendant, however. Neither Lumpkin's nor Heatherly's actions can be "regarded as atrocious and utterly intolerable in a civilized society," American Road Service Co. v. Inmon,supra. Both defendants made motions for directed verdict specifically directed to the outrage claims, which were denied, and the jury returned a general verdict. See Treadwell Ford,Inc. v. Campbell, 485 So.2d 312 (Ala. 1986), appeal dismissed, ___ U.S. ___, 108 S.Ct. 2007, 100 L.Ed.2d 596 (1988); Aspinwallv. Gowens, 405 So.2d 134 (Ala. 1981). Therefore, the judgment on the verdict cannot stand, and the cause must be remanded for a new trial on the malicious prosecution claim.
The defense of sovereign immunity does not bar suits against state officers and employees for torts committed willfully, maliciously, and outside the scope of their authority.Barnes v. Dale, 530 So.2d 770 (Ala. 1988); DeStafney v.University of Alabama, 413 So.2d 391 (Ala. 1982); Milton *Page 66 v. Espey, 356 So.2d 1201 (Ala. 1978); Unzicker v. State,346 So.2d 931 (Ala. 1977). The facts presented a jury question on this issue.
Because the other issues relating to the conduct of the trial and the form of the verdict will not necessarily recur on a new trial, we pretermit consideration of them at this time. Without deciding the claim that the verdict impermissibly apportioned damages, we note that the rule is that a plaintiff may have only a single recovery against joint tort-feasors and that the complaint generally alleged that Cofield was damaged "as a direct and proximate result of [the] aforesaid criminal action against him." See Ex parte City of Huntsville, 456 So.2d 72
(Ala. 1984); Vanguard Industrial Corp. v. Alabama Power Co.,455 So.2d 837 (Ala. 1984).
For the foregoing reasons, the judgment is reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.