[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1210 
Continental Casualty Insurance Company ("CNA") appeals from a judgment on a jury verdict awarding $750,000 to Robert McDonald on his claim alleging the tort of outrage. CNA argues that the evidence failed to establish the tort of outrage; that the trial court erred in instructing the jury; that the action is barred, at least in part, by the statute of limitations; and that the damages awarded are excessive. McDonald cross appeals, arguing that, if the judgment is reversed, the trial court should be held to have erred in granting a motion in limine filed by CNA.
McDonald suffered a back injury in 1976 while working for Akwell Industries. He filed a workmen's compensation action in 1978 against CNA, as the workmen's compensation insurance carrier for Akwell. The disability portion of McDonald's claim was settled for $12,000, and CNA remained liable for his medical expenses arising from the injury. McDonald had a total of five surgeries on his back, concluding in 1981. He remained disabled and in pain, but his doctors concluded that no further surgery would be helpful.
This controversy arose over CNA's handling of McDonald's claims for medical expenses. McDonald contends that CNA, in an attempt to minimize its exposure, tried to coerce him into settling for a small lumpsum settlement of his medical claim. He argues that CNA delayed payments to doctors, hospitals, and pharmacists for unreasonable lengths of time, causing, for example, hospitals to threaten collection actions against him and a pharmacy to refuse to provide further pain medication. CNA also resisted paying for a hot tub or whirlpool bath prescribed by McDonald's doctor, suggesting instead membership in a health spa or other in-home alternatives. McDonald argues that CNA intentionally caused him severe emotional distress by these and other actions in its handling of his medical expenses.
The tort of outrage, or intentional infliction of severe emotional distress, was first recognized by this Court inAmerican *Page 1211 Road Service Co. v. Inmon, 394 So.2d 361 (Ala. 1980):
 "[W]illful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby, and we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement [(Second) of Torts, § 46 (1965)], at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72."
394 So.2d at 365.
This Court held in Garvin v. Shewbart, 442 So.2d 80
(Ala. 1983),[1] that claims of outrage are not barred in workmen's compensation contexts by the exclusivity provisions, Ala. Code 1975, §§ 25-5-11, -52, and -53, of the workmen's compensation statutes. Thus, those provisions provide no bar to this action.
This Court has applied the stringent Inmon test rather strictly, to hold in a number of cases that alleged conduct did not present a jury question on the tort of outrage. See, e.g.,Goodwin v. Barry Miller Chevrolet, Inc., 543 So.2d 1171
(Ala. 1989); Nail v. Jefferson County Truck Growers Ass'n, Inc.,542 So.2d 1208 (Ala. 1988); Lumpkin v. Cofield, 536 So.2d 62
(Ala. 1988); Gallups v. Cotter, 534 So.2d 585 (Ala. 1988);Williams v. Marcum, 519 So.2d 473 (Ala. 1987); Handley v.Richards, 518 So.2d 682 (Ala. 1987); Crowder v. Memory HillGardens, Inc., 516 So.2d 602 (Ala. 1987); Jackson v. ColonialBaking Co., 507 So.2d 1310 (Ala. 1987); Livingston v. MobileMemorial Gardens, Inc., 504 So.2d 256 (Ala. 1987); Therrell v.Fonde, 495 So.2d 1046 (Ala. 1986); McIsaac v. WZEWFM Corp.,495 So.2d 649 (Ala. 1986); Surrency v. Harbison, 489 So.2d 1097
(Ala. 1986); Logan v. Sears, Roebuck Co., 466 So.2d 121
(Ala. 1985).
In Inmon itself, the Court held that the plaintiff's evidence did not present a jury question on the cause of action. Among its cautionary statements in that opinion, the Court said: "It should be noted that this tort does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' Comment, Restatement,supra, at 73." 394 So.2d at 364-65.
On the other hand, this case is postured so that the standards for reviewing the sufficiency of the evidence are in favor of the plaintiff, McDonald. The trial court denied CNA's motions for summary judgment and directed verdict and entered judgment on the verdict, denying CNA's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial or a remittitur.
 "A jury's verdict is presumed correct and will not be disturbed unless plainly erroneous or manifestly unjust. This presumption of correctness is further strengthened when a motion for new trial is denied by the trial judge. . . .
 "In reviewing the correctness of a jury verdict, this Court must review the record in a light most favorable to the appellee."
Pate v. Sunset Funeral Home, 465 So.2d 347, 350 (Ala. 1984) (citations omitted); Campbell v. Burns, 512 So.2d 1341
(Ala. 1987); Hallman v. Summerville, 495 So.2d 626 (Ala. 1986);Woods v. Laster, 291 Ala. 139, 279 So.2d 121 (1973). Because the jury returned a verdict for McDonald, any disputed questions of fact must be resolved in his favor and, if necessary to support the verdict, it must be presumed that the jury *Page 1212 
drew any reasonable inferences supporting its verdict that might have been drawn from those facts.
Thus, keeping in mind both the stringency of the test for the tort of outrage and the presumptions in favor of the verdict and judgment, we shall set forth so much of the material, pertinent evidence as is necessary for deciding this case.
CNA's records indicate that it closed McDonald's file in late 1981, but reopened it in 1982 when it received communications from McDonald and his doctors. The file includes a note dated May 19, 1982, stating in part, "I believe if Mr. McDonald is going to have continued problems. Will settle in BSO." Debbie Malinak, a CNA claims specialist who had been handling McDonald's file since October 1981, testified that "BSO" stands for "benefit settlement option," which is a structured settlement of the claim that would extinguish CNA's liability for further medical payments.
Also on May 19, 1982, CNA ordered an "activities check" on McDonald, presumably to determine if he was malingering. Equifax Services generated a report in August 1982 indicating that McDonald's neighbors confirmed that McDonald had back pain, that he walked with a cane, that he did not bend or lift anything, and that he did not work. CNA ordered another Equifax report in 1983, and the summary of that report in CNA's file confirms that "All sources interviewed state claimant in bad shape. Has not worked for 4-5 years and does not have physical activity." All of the information available to CNA from 1982 on confirmed that, as McDonald's doctor stated in a 1985 letter, McDonald was in constant moderate to severe pain with periodic spasms of extreme pain. In fact, his doctor testified at trial that, on a pain scale of 0 to 10, McDonald was usually at 6 or 7, seldom below 4, and sometimes at 9 or 10.
On May 26, 1982, CNA's estimate on McDonald's future medical expenses was $15,000. On June 14, it revised that figure to $72,644. Its claims supervisor wrote on the file, "I can't believe we will spend $72,000 more."
On December 15, 1983, Malinak sent McDonald an offer of $100 per month or $1000 per year for life in settlement of McDonald's medical claim. Malinak had received authority to offer $1500 per year for life. The cost of annuities to set up the plans offered would have been $11,495 for the monthly payment or $9096 for the $1000 annual payment. McDonald telephoned Malinak on December 28 and told her he did not want to settle. Malinak produced annual reports for the file beginning in 1983 stating that the "action plan" was to try to persuade McDonald to settle.
McDonald introduced a great deal of evidence from which the jury could have concluded that CNA engaged in a pattern of delays in order to cause distress to McDonald and pressure him into accepting a settlement. A few examples follow.
In March 1984 CNA received a letter from the Florida Department of Insurance attaching a copy of a "service request" from a Holmes County Hospital regarding CNA's failure to pay it for treating McDonald. The request included the following statement by a hospital employee:
 "Have done follow-up's with insurance co. The last three times have talked with Debbie Malinak, she said they needed information from medical records. I have checked with medical records each time I call and speak with Ms. Malinak. To this date (2-28-84) we still have no letter from insurance co. requesting medical records. We would appreciate your assistance in this matter."
Malinak testified that she was aware that the hospital was threatening McDonald with lawsuits over the unpaid bills. She contended at trial that she had requested information from the hospital because the treatment had not been authorized.
McDonald wrote to Malinak on April 5, 1985, complaining about the long delays in paying his medical bills from his pharmacy, hospital, and doctors. He wrote her again in August 1985, complaining about difficulties in obtaining approval to attend a pain clinic at Duke University. The following is an excerpt: *Page 1213 
 "I asked you by phone yesterday if my admission had been approved and I still received the same non-commital response. You stated that you felt it could be approved if you received all the data you need from Duke. Only God and CNA know what further data you are talking about. Neither Dr. Brooks nor I understand these unnecessary delays. . . .
 "Ms. Malinak due to the long delay in being treated at the proper facility my pain has increased and is harder to deal with because of frustration and anxiety. Dr. Brooks, myself, and my family now have a constant struggle controlling my narcotic intake. All of us on this end are trying to cooperate and be patient, but please believe me patience is running very thin."
McDonald introduced exhibits from health care providers. One doctor filed a claim four times, beginning on December 2, 1985, before receiving payment on September 27, 1986. An employee of Doctors' Memorial Hospital wrote in 1986 that she had tried to call Malinak 6 times in 10 days, was told that Malinak would return her call, but never heard from Malinak. The administrator of that hospital wrote to McDonald on April 3, 1987:
 "I am writing to request your assistance in securing payments from your insurance company, C.N.A. of Atlanta, GA. The time it takes to get a payment on your accounts has steadily increased taking longer and longer to receive payment from the time of billing to your company. Several of these accounts go back to November 1986 and no payments have been made despite repeated notices to your insurance company.
 "As your disability is one of chronic back pain, we understand the necessity of the services rendered to you. We are proud to offer these services to you; however, we need some assistance from you in securing payments on these accounts which now total over $1,800.00.
 "Continued slow payments by your insurance company may result in these accounts being placed with a third party for collection. Your assistance and understanding is appreciated. If you have any questions, please call me."
Malinak testified that she remembered being made aware of that letter.
Al Johnson, of Johnson's pharmacy, wrote the following letter in November 1986 to McDonald's attorney:
 "Robert McDonald's insurance company, CNA, has caused us a great amount of problems concerning his medical bills. This has caused Mr. McDonald a great deal of stress.
 "Any help you could give us concerning this matter would be greatly appreciated by not only us but Mr. McDonald also.
 "To date, CNA's bills exceed five hundred dollars. It generally takes 6-8 weeks before we receive payment."
On March 2, 1987, Johnson wrote that CNA was past due $887.49 and that "This is not uncommon with this insurance company." On March 27, 1987, Johnson wrote to McDonald that "[W]e can no longer fill any of your prescriptions due to nonpayment from your insurance company handling your workman's compensation."
McDonald's doctor, Dr. Brooks, whom CNA had selected, wrote a letter to CNA's attorney on August 23, 1986, stating:
 "This letter is to inform you that multiple delays in treatment are very detrimental to Mr. McDonald's physical condition and also are causing an increase in his narcotic dependency problem. In my communications with CNA Insurance Company, there is no one that seems to be able to give a definite answer as to when and how Mr. McDonald's medical problems will be taken care of financially.
 "Anything you could do to expedite this process would be sincerely appreciated."
Malinak testified that she remembered seeing that letter.
A letter from McDonald to Malinak on May 22, 1985, substantiates his claim that CNA was pressuring him to settle. It refers to her written settlement offer in 1983 and continues: *Page 1214 
 "I rejected the proposal then as being absurd and ridiculously low. In reviewing my medical expenses since that time and realizing that medical costs are going up each day its apparent that I made the right choice. You have asked me since that time on several occasions by phone conversations if I would be willing to settle the medical portion of my claim. Due to the fact that in the past and even at present I always experience many problems in dealing with your company which adds a great deal of stress to an existing severe physical condition, I most certainly would be willing to settle the medical portion of my claim if the settlement figure was high enough to meet my present and future medical expenses allowing for future inflation of medical expenses. Please understand that I am not anxious to settle, I just simply want my bills to be paid promptly and all of the appliances (wheelchair ramp) that are prescribed now or in the future to be provided without the very unnecessary emotional strain that my family and I have experienced in the past."
The final straw for McDonald came when his doctor prescribed a whirlpool bath or hot tub, referred to by the parties as a "Jacuzzi," for pain relief. The prescription is dated November 3, 1986. On November 5, 1986, McDonald's attorney wrote the following letter to Malinak:
 "Please be advised that I represent Mr. Robert McDonald. I have enclosed various bills which CNA has refused to pay. I have also enclosed a prescription from Dr. Brooks prescribing a hot tub or Jacuzzi for my client. An estimate for the cost of installing the hot tub or Jacuzzi is approximately $8,000. I understand that Dr. Brooks prescribed this hot tub to help my client abstain from taking narcotic type drugs to alleviate his pain.
 "I am at a complete loss as to why you have refused these medical bills and why my client has to go through the harassment of receiving letters from lawyers and past due statements from hospitals. In the event all bills are not paid and proof provided to me to show that said bills have been paid within ten days and I receive correspondence from you indicating your willingness to provide my client the above mentioned hot tub or Jacuzzi, it will be my intent to enter suit without further notice."
Malinak responded on November 13:
 "This is in response to your letter of November 5, 1986. We feel that we have been more than reasonable in authorizing medical treatment for Mr. McDonald; therefore, we will not be able to authorize a Jacuzzi. We have been advised that there is a device that can be obtained from K-Mart to put in one's own personal bathtub that will give the Jacuzzi effect. We will be willing to authorize this device for Mr. McDonald. We would also be willing to authorize Mr. McDonald to attend physical therapy or a possible enrollment in a health spa.
 "We have as of this date purchased a waterbed, a ramp and an exercise cycle in addition to paying emergency room bills for Mr. McDonald on a daily basis. Certainly you can understand how one or two bills could have been missed. We at this time are catching all of Mr. McDonald's bills received to date paid [sic].
 "We would be willing, however, to offer some type of structured settlement for Mr. McDonald's future medical bills."
Dr. Brooks wrote a letter on November 25 explaining why neither of the alternatives Malinak suggested would be acceptable:
 "We have requested a Jacuzzi for Mr. McDonald for medical reasons due to his back problems. A K-Mart device to put in the bathtub will not give the same effects as a Jacuzzi because the tub is not deep enough for Mr. McDonald to get [immersed] enough in the water for the effect of buoyancy to lighten the weight on the back. Mr. McDonald is unable to bend appropriately to get into a bathtub well [whereas] he could step down into a Jacuzzi and he needs the water at least up to nipple level to provide the proper buoyancy. The only health spa in the area closed approximately two weeks ago due to insufficient use and insufficient funding and none *Page 1215 
other is available within reasonable drive. As for his physical therapy, the nearest physical therapy unit is a rather long drive and on the way back driving that long Mr. McDonald's back would be in the same shape as it would be in prior to the physical therapy. He is unable to sit in a car for prolonged periods without severe pain."
On December 4, McDonald's attorney sent this letter to Malinak, along with copies of letters from McDonald's hospital stating that the account was delinquent, from a law firm telling McDonald that it had begun collection efforts, and from Johnson's pharmacy (quoted above) regarding problems with CNA's payments.
In response, Malinak wrote the following letter to Dr. Brooks on January 20, 1987:
 "We note that you are proposing a Jacuzzi for Mr. McDonald. At this time, we would like to have your opinion as to whether the services of a health spa would create the same effect for Mr. McDonald. Also, we have been advised that there is a device that can be put in a regular bathtub that gives the Jacuzzi effect and would like to know if you feel that this device would be suitable for Mr. McDonald."
Dr. Brooks responded on January 23, saying essentially the same things he had said in his letter of November 25. Malinak continued to refuse to provide the hot tub as prescribed, and McDonald filed this action on March 27, 1987.
The evidence from the witness stand was consistent with the above-cited documentary evidence. McDonald and his wife testified in detail about the difficulties they had in working with CNA and the stress placed on McDonald. Malinak stated that the delays in payment arose because McDonald was incurring so many bills, especially trips to the emergency room for pain medication, and CNA was concerned that it was receiving multiple billings for the same treatments. Regarding the hot tub dispute, Malinak took the positions that the unavailability of a health spa was due to McDonald's own decision to live in a rural area and that CNA would not want to pay for an expensive hot tub and then have to install another one if McDonald moved.
Before deciding the principal issue of whether the evidence supported the submission of the claim of outrage to the jury, we deem it useful to address two of the other issues first: whether the action is barred, at least in part, by the statute of limitations, and whether the court erred in instructing the jury.
The statutory period of limitations for the tort of outrage is two years. Ala. Code 1975, § 6-2-38; Archie v. EnterpriseHospital Nursing Home, 508 So.2d 693 (Ala. 1987); Eidson v.Johns-Ridout's Chapels, Inc., 508 So.2d 697 (Ala. 1987). CNA argues that the action is barred because, if there was any cause of action for outrage under these facts, it arose more than two years before the claim was filed, or, alternatively, that McDonald should not have been allowed to recover damages for conduct occurring prior to March 27, 1985, i.e., more than two years before the complaint was filed.
The trial court denied CNA's motion for directed verdict based on the statute of limitations, holding that "the tort of outrage is a continuous tort" and citing Garrett v. RaytheonCo., 368 So.2d 516 (Ala. 1979). Similarly, McDonald cites Moonv. Harco Drugs, Inc., 435 So.2d 218, 220 (Ala. 1983), for its statement, "This Court has used the term 'continuous tort' to describe a defendant's repeated tortious conduct which has repeatedly and continuously injured a plaintiff," and argues that CNA's actions constituted such a continuous tort for which the period of limitations had not run when he filed this action.
The merit in the trial court's holding and in McDonald's argument can be seen by contrasting this case with Garvin v.Shewbart, 564 So.2d 428 (Ala. 1990) ("Garvin II"). That action was also a claim against CNA for outrageous conduct in its processing of workmen's compensation medical payments for a back injury. In that case, CNA insisted on Garvin's seeing a physician of its choice for a second opinion on whether she needed further surgery. That insistence, together with refusals by the *Page 1216 
designated doctors to see her until they had her records and for other reasons, resulted in a delay of the surgery for more than two years, from the time she initially sought a second opinion until after she filed suit against CNA. This Court affirmed the summary judgment for CNA, holding that the alleged conduct did not meet the Inmon test for outrageous conduct and that "CNA was doing 'no more than [insisting] upon [its] legal rights in a permissible way,' Inmon, at 368," 564 So.2d at 431
(brackets in Garvin II). See also Glenn v. Vulcan MaterialsCo., 534 So.2d 598 (Ala. 1988);[2] Nabors v. St. Paul Ins. Co.,489 So.2d 573 (Ala. 1986).
Thus, there is clearly a threshold beyond which an insurance company's recalcitrance must go before it crosses into outrageous conduct. If we were to hold that McDonald was barred from bringing this action upon the expiration of one[3] or two years after the first time he suffered severe emotional distress over CNA's handling of his claim, we would place plaintiffs in the untenable position of not knowing whether their claim is premature and thus subject to summary judgment for lack of a genuine question of material fact, as in GarvinII, or has been in existence long enough for the period of limitations to run, as CNA argues here. The better policy would be to encourage cooperation and attempts to work out differences, like McDonald's attempts in this case, and to preserve the cause of action should those attempts prove futile.
The Court in Garrett v. Raytheon, supra, held that the cause of action for radiation exposure began to run from the last exposure. Similarly, an action such as this, arising from continuing dealings between the parties, will not be barred until two years after the last tortious act by the defendant, particularly where the defendant's conduct does not cross the threshold and become an actionable tort until it is demonstrably extreme and outrageous.
CNA argues in the alternative that any damages McDonald may have suffered from its conduct prior to March 27, 1985, should have been excluded from the jury's consideration. Garrett v.Raytheon observed that recovery for a continuous tort is limited to those damages that occurred within the period of limitations, citing American Mutual Liability Ins. Co. v.Agricola Furnace Co., 236 Ala. 535, 183 So. 677 (1938), andHowell v. City of Dothan, 234 Ala. 158, 174 So. 624 (1937).
CNA did not request any jury instruction for such a limitation on the damages, however. The only colorable attempt to raise this issue before the jury retired was in CNA's motion for summary judgment or, alternatively, partial summary judgment on the ground that recovery was barred for any damages accruing more than two years before the complaint was filed. Because of the continuing nature of the tort and the injury, because there were no severable claims for earlier injuries, and because the allegations were of an ongoing pattern of conduct, there was no aspect of the claim as to which summary judgment could have been entered. At most, a motion in limine precluding evidence of earlier conduct causing distress might have been appropriate.[4] We decline to decide that question, however, because we question whether the limitation-of-damages rule would even apply to an outrage case such as this, where the questions are so problematic as to when the conduct rises to the level of outrage and when the emotional distress rises to the necessary level of severity. In a case where the question is properly presented by an attempt to limit the evidence or the damages, it might well be that earlier conduct, not necessarily actionable as outrage initially, could be *Page 1217 
brought within a later-filed action as part of an ongoing pattern or scheme, at least where the earlier injuries or damages are not discrete or severable from the later ones, as is the case here.
In sum, this action was not barred by the statute of limitations, because CNA's conduct, if it was tortious at all, was in the nature of a continuing tort, and that conduct was continuing even up to the time the action was filed. The question of whether the recovery should have been limited to damages within the period of limitations is not presented on the record and will not be decided.
CNA next argues that the court erred in instructing the jury, the gist of its argument being that the court instructed the jury on aspects of workmen's compensation law that were not presented in this action, failed to instruct the jury on the effect its verdict would have on CNA's liability for medical payments, and gave at McDonald's request certain instructions on the tort of outrage that were incomplete or misleading.
Over CNA's objection, the trial court gave the following instructions requested by McDonald:
"Charge No. I.
 "I charge you ladies and gentlemen of the jury that under the laws of Alabama a workmen's compensation insurance carrier which has responsibility for a work-related injury to an employee is required to pay the actual cost of reasonably necessary medical and surgical treatment, physical rehabilitation, medicine, medical and surgical supplies, crutches, artificial member and other apparatus as may be ordered by the approved physician for the injured employee."
"Charge No. V.
 "I charge you ladies and gentlemen of jury that in a case of admitted responsibility for workmen's compensation coverage for an injury such as we have in this case, if the insurer contests the 'reasonably necessary' aspect of any medical service or apparatus ordered by the physician, approved by the insurer, the burden of proof to establish such service or apparatus is not reasonably necessary is upon the defendant insurance company."
These charges were proper because the respective rights and duties of the parties as workmen's compensation insurer and insurance beneficiary were crucial to the question of whether CNA had "done no more than to insist upon [its] legal rights in a permissible way." Inmon, 394 So.2d at 368, quoting Comment g
to § 46 of the Restatement (Second) of Torts (1965). Just as CNA insisted in the Garvin II case on its right to have a second physician selected pursuant to the procedure under Ala. Code 1975, § 25-5-77(a), it argued in this case that it merely exercised its right under that section to question whether the costs submitted were "reasonably necessary." For example, CNA argued that it had questioned whether the hot tub or Jacuzzi was a reasonably necessary medical expense. The instructions quoted above properly bore on the question of whether CNA had insisted on its legal rights in a permissible way.
Nor is there any merit to CNA's argument that the quoted instructions may have caused the jury to be confused as to whether the case presented any questions of workmen's compensation law. The court gave the following instruction at CNA's request:
 "The Court charges the jury that this case does not involve any claims for benefits under the workman's compensation law of the State of Alabama. In order to find in favor of the plaintiff, you must be reasonably satisfied from the evidence that the plaintiff has proven each and every element of the tort of outrage as previously outlined to you by the Court."
The trial court did not err in giving McDonald's charges numbered one and five.
CNA also argues that the court erred in refusing to instruct the jury in *Page 1218 
accordance with its requested charge number eight:
 "I charge you ladies and gentlemen of the jury that it is stipulated that [CNA] has responsibility to plaintiff for compensation for lifetime medical benefits which are reasonably necessary and which relate to the back injury suffered by plaintiff in October 1976. The Court charges you that, under the law of Alabama, this responsibility shall continue whether you find a verdict in favor of the plaintiff or the defendant in this lawsuit."
Instead, the trial court gave a jury charge requested by McDonald that was similar to the first sentence of the above charge but omitted the second sentence.
CNA did not give any specific objection to the refusal to give charge number eight. When the court listed which of CNA's requested instructions it was giving and which it was refusing, CNA's attorney simply said, "We except to the court's refusing eight and ten."
CNA argues that the error in refusing its charge eight was compounded or at least confirmed by an event that occurred during the jury's deliberations. The jury submitted to the court the following question: "Does our decision affect the medical bills that Mr. McDonald may incur in the future or does CNA still pay for them?" The record shows the court's answer and responses by the attorneys:
 "I have consulted with counsel for both parties. The Court answers you as follows: It has been stipulated that under the laws of Alabama, CNA has a responsibility for all reasonable necessary medical bills for Robert McDonald's lifetime related to this injury of October, 1976. I can not further — I can not answer your questions any further than to tell you what the obligations are under the law of Alabama. Is the Plaintiff satisfied?
"Mr. Heninger: Yes, sir.
"The Court: Is the Defendant satisfied?
"Mr. Baxley: Defendant is satisfied.
 "[The court read the answer again, spoke to the jury about not smoking in the jury room, and asked:] Do any of the attorneys have a problem with that?
"Mr. Heninger: No, sir.
"Mr. Baxley: No, sir.
"The Court: Approach the bench.
"(Off the Record discussion.)
"Mr. Baxley: I offer Number Eight at this point.
"The Court: Refused."
The failure to record the discussion at the bench prevents there being any basis for reversing the court in this matter. CNA's attorney stated for the record that CNA was satisfied with the answer given to the jury's question. We fail to see how CNA may have been prejudiced by the failure to give charge number eight when the court instructed the jury that CNA "has a responsibility" under the law for McDonald's reasonably necessary lifetime medical expenses arising from his workplace injury. No reversible error is presented regarding the trial court's refusal to give requested charge number eight.
CNA also argues that the court erred in giving two of McDonald's charges on the tort of outrage:
"Charge No. III.
 "I charge you ladies and gentlemen of the jury that if you are reasonably satisfied from the evidence that the defendant insurance company intentionally failed to pay or intentionally delayed or obstructed the payment of actual costs for reasonably necessary medical expenses and treatment for plaintiff related to this workmen's compensation injury with the intent to cause severe emotional distress to the plaintiff you may find the defendant guilty of outrageous conduct."
"Charge No. VII.
 "I charge you ladies and gentlemen of the jury that in determining whether you are reasonably satisfied from the evidence that the defendant insurance company engaged in intentional or reckless conduct which was so outrageous in character and so extreme in degree so *Page 1219 
[sic] as not to be tolerated in a civilized society, you may consider [1] the defendant's pattern of activity; [2] whether its behavior involved others; [3] whether the defendant's acts were directed towards the plaintiff when the defendant was likely to know that severe, emotional distress could have serious physical repercussions; and, [4] whether those actions were directed towards the illegal purpose of denying reasonably necessary medical expenses of the plaintiff arising from this workmen's compensation injury."
CNA argues that charge number three was incomplete because it omitted the requirements for outrage that the emotional distress must be "extremely severe," that the distress must be caused by the defendant's conduct, and that the defendant's conduct must be extreme and outrageous. CNA similarly argues that charge number seven omitted elements of the tort of outrage. There was no such error in light of the entire charge, because the court carefully instructed the jury on several occasions as to the elements of the tort of outrage.
CNA argues that charge number seven was misleading because it "sets forth a number of factors which the jury might have been misled into believing were determinative of whether conduct is 'outrageous.' " Those "factors," to which we have added the numbers one through four in brackets, closely track the language of Rice v. United Ins. Co. of America, 465 So.2d 1100,1102 (Ala. 1984), in which the Court listed four aspects distinguishing Rice's claim from that at issue in Inmon. We agree with CNA that those factors are not determinative; however, the trial court did not present them as such, but only as things "you [the jury] may consider." In light of the trial court's repeated instructions that the elements of the tort must be met and in light of this Court's recitation of the same four factors in Rice, we cannot hold the trial court in error for giving instruction number seven.
The preceding recitations of portions of the evidence and discussions of the issues regarding the statute of limitations and the jury instructions present a relatively complete picture of McDonald's position as to how CNA committed the tort of outrage. We now turn to CNA's argument that the evidence did not support the claim of outrage and that, thus, the trial court should have granted its motion for directed verdict or judgment notwithstanding the verdict.
The evidence recited above is sufficient to show that the jury could have found that McDonald suffered severe emotional distress because of the manner in which CNA handled his claims for medical payments. The more difficult question is whether there was evidence from which a jury could permissibly find that CNA's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society." Inmon, 394 So.2d at 365.
In response to CNA's arguments that its handling of the claim did not amount to outrageous conduct, McDonald citesInmon's references to some of the comments to § 46 of theRestatement (Second) of Torts (1965), and points to otherRestatement comments that he argues are relevant to this action. Inmon quoted the last sentence of comment e, which states that the actor is not held liable for mere insults, indignities, or annoyances, but McDonald also quotes the first sentence: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." McDonald also quotes the first sentence of comment f: "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."[5] McDonald *Page 1220 
argues that the two comments quoted above apply to this case because, he argues, CNA abused its "power to affect his interests" and because, he further argues, CNA knew, and took advantage of the fact that, he was peculiarly susceptible to emotional distress because of his constant pain, his need for treatment for that pain, and his dependence on CNA to obtain that treatment.
We do not adopt the Restatement's comments to their full extent as the law of this state; indeed, the very comments quoted by McDonald have cautionary and limiting language emphasizing that the conduct must be extreme and outrageous and that the emotional distress suffered must be severe. Nevertheless, the points made about the power of CNA to affect McDonald's interest and his dependent condition are pertinent to this case.
This case is remarkably like Garvin II, but is also unlike it for the reasons stated above, i.e., that CNA in that case did no more than to insist on its legal rights in a permissible way. In this case, CNA put forth justifications for its delays in payments, but the jury was entitled to disbelieve CNA's evidence because of the pervasive nature of the delays, the lack of any reasonable explanation for most of them, and the evidence that CNA was attempting to "persuade" McDonald to accept a settlement that would greatly reduce the amount that CNA would have to pay for McDonald's medical expenses. CNA had a legal right to question the reasonable necessity of the expenses, but it did so in only a very few cases, such as the Jacuzzi. Even in that instance, the jury could have concluded that CNA did not insist on its legal rights in a permissible way, because, for example, it could have found that Malinak deliberately ignored Dr. Brooks's explanations in December 1986 as to why a bathtub insert or a health spa was not an acceptable alternative but, instead, wrote to him in January 1987 asking the same question again, inferrably for the sole purpose of delaying or hindering payment of the claim. In short, CNA had no legal right to delay payments for no good reason, and the jury could have found that, on occasions when CNA did assert its legal rights, it did not do so in a permissible way.
This case is also distinguishable from Garvin II in other respects. McDonald's need for treatment for his pain was an immediate, day-to-day need, whereas Garvin's possible need for a third surgery was not. There was pervasive evidence here that McDonald's pain was unusually severe and rendered him especially subject to emotional distress over the continuing availability of treatment, and that CNA engaged in repeated conduct that brought the availability of treatment into doubt. Garvin's attempts to show that she was suffering distress from the delays in seeing a physician for a second surgery opinion did not so clearly cross the line of "severe distress" and "outrageous conduct" that the trial court could be held in error for holding that she had not satisfied the test for the tort of outrage. CNA's dilatory handling of McDonald's claims encompassed a whole spectrum of different claims over a period of five years or more, whereas its (most recent) dispute with Garvin did not ripen into unusual delays or hindrances until some time during the two-year period during which Garvin was seeking a second opinion.[6] Most significantly, perhaps, McDonald has produced evidence from CNA's own records and communications that its goal in dealing with him was to persuade him, or, as the jury may have found, to coerce him, to settle for a lump-sum benefit, whereas Garvin produced no such direct evidence of an arguably improper motive in its dealings with her.
In short, the trial court held that Garvin had not presented sufficient evidence in *Page 1221 
opposition to CNA's motion for summary judgment to meet the test for the tort of outrage. As the Court stated inInmon, "the trial court determine[s] in the first instance whether recovery is indicated." 394 So.2d at 365. One of Garvin's difficulties in maintaining an action was that she had recently settled a prior outrage claim against CNA for its earlier conduct in handling her claim, so only a narrow portion of its entire course of conduct was pertinent to her second action. This Court affirmed the trial court's holding that the conduct at issue did not meet the stringent Inmon test.
This case is different. The trial court held that the evidence was sufficient to present a jury question, and we see no error in that holding. The jury was entitled to believe that CNA engaged in a deliberate effort to cause McDonald to suffer severe emotional distress in order to coerce him into accepting an unreasonably low lump-sum settlement that would drastically reduce CNA's liability for his medical expenses. The evidence supports a finding that CNA systematically withheld payments in order to cause McDonald anguish over the possibility of the cessation of medical treatments for his pain and thereby to cause him to accept a method of payment that would not subject him to CNA's "aggravation," as he called it. A jury could reasonably find from the evidence that such conduct was "beyond all possible bounds of decency, . . . atrocious[,] and utterly intolerable in a civilized society." Inmon, at 365. Therefore, the denial of CNA's motion for directed verdict and its post-trial motions was not error.
In denying CNA's motion for a remittitur, the court entered the following order:
 "[T]his review is in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986). The Court is aware that its function is not to substitute its judgment for that of the jury, but in accordance with Hammond, the Court sets forth the following:
 "The trial of this case was presented expertly and professionally by counsel for both parties. Proper motions were filed and argued for Plaintiff and Defendants. Trial of this case lasted approximately four days with approximately 70 exhibits being introduced by Plaintiff showing instances of failure to pay Plaintiff's medical bills within a reasonable time. Evidence was submitted that Defendants were late in paying Plaintiff's medical bills from 1980 until 1986. The evidence was undisputed that Plaintiff was in severe pain and was taking an excessive amount of narcotic drugs to relieve his pain. This evidence further showed that Plaintiff employed several different legal firms to correspond with Defendants regarding the late payment of these medical bills and that Plaintiff received delinquent notices from medical providers. The hospital which provided Plaintiff's medical treatment filed a complaint against Defendants with the Florida Insurance Commission for failure to properly pay the medical bills. A physician employed by Defendants reported that multiple delays in Plaintiff's treatment would be very detrimental to his physical condition.
 "The evidence further showed that Defendants expected an outlay of from $71,000.00 to $115,000.00 for Plaintiff's medical bills, yet offered Plaintiff the sum of $1,500.00 per month [sic, year][7] for life to settle his claim. Plaintiff indicated that he was willing to settle his claim upon receipt of a reasonable offer, but the offer of settlement would not pay his medical bills. Defendants did not respond to Plaintiff's request for reasonableness.
 "The jury in this case listened carefully to the evidence, arguments of counsel, and the law which was submitted for consideration. This court is aware of no makeup or trait of this jury nor of any bias or prejudicial evidence before the *Page 1222 
jury that would lead this court to believe that the award of damages was based on anything other than the evidence presented. The jury's task was to decide a factual situation based on the evidence presented as to whether Defendants had committed the tort of outrage against Plaintiff and the amount of damages to assess.
 "The Court is of the opinion that the jury understood the issues, that the Court's rulings were not prejudicial to Defendants, and that the damages awarded were not so excessive as to warrant a remittitur.
 "This Court further recognizes that the nature of the Alabama Workmen's Compensation Act requires that employees who fall within the protection of these statutes have confidence that their medical bills will be timely paid, and to deter defendants from future conduct such as was evidenced here when paying medical bills owed under our compensation laws [sic]. Indeed, the guarantee of payment of future medicals is a major factor considered by injured employees when settling their workman's compensation claims.
 "The court, therefore, finds that the case was tried before a fair and impartial jury, and that there was no evidence that the jury acted improperly or that the verdict was based on prejudice or sympathy. The Court further finds that much of the evidence presented would support the verdict as to damages."
We see no error in the above, and we likewise reject CNA's arguments that it is due to be granted a remittitur.
Because of our affirmance on the appeal, the cross appeal is moot and is therefore due to be dismissed.
88-1383 — AFFIRMED.
88-1453 — DISMISSED AS MOOT.
HORNSBY, C.J., and MADDOX, JONES, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.
[1] Overruled on other grounds, Lowman v. Piedmont Exec. ShirtMfg. Co., 547 So.2d 90 (Ala. 1989).
[2] Overruled on other grounds, Lowman v. Piedmont Exec. ShirtMfg. Co., 547 So.2d 90 (Ala. 1989).
[3] The one-year statute of limitations was repealed effective January 9, 1985. See former § 6-2-39.
[4] Indeed, CNA filed such a motion in limine regarding an internal memo it had produced during the pendency of McDonald's workmen's compensation claim. The trial court granted that motion, citing the principle of res judicata. That order is the subject of the cross appeal.
[5] Shortly after Inmon was decided, this comment was cited by Judge Hobbs in entering judgment on a jury verdict for a plaintiff in an outrage case. Holmes v. Oxford Chemicals, Inc.,510 F. Supp. 915 (M.D. Ala. 1981), affirmed, 672 F.2d 854 (11th Cir. 1982).
[6] In March 1985, Garvin had settled a prior action against CNA that had included a claim of outrage. On August 26, 1986, she filed the action that was the subject of her second appeal. Thus, her claim of outrage against which we recently affirmed summary judgment related only to that 17-month period, which spanned most of the time that she was trying to get a second opinion on surgery.
[7] Of course, CNA only offered McDonald $1,000 per year. In writing his order, the judge probably recalled that CNA had authorized an offer of $1,500 per year but did not recall that the actual offer had never been raised that high. The use of the word "month" is obviously only an error of inadvertance.