Nora Mann Burdette entered the emergency room of Lakeshore Community Hospital ("Lakeshore") on the evening of July 15, 1993, complaining of chest pain, nausea, and pain in her arm. Her heart rate was normal, and her blood pressure was only slightly elevated. Burdette was treated by Dr. Gerhard Jan Hinnen, a doctor on call in the Lakeshore emergency room, who performed a physical examination and ordered an EKG and cardiac enzyme tests. Dr. Hinnen evaluated the test results; he found no sign of a heart attack on the EKG and found normal results on the enzyme tests. Burdette was given a "GI cocktail," a medicine mixture to relieve stomach upset, and she left the emergency room about 1 1/2 hours after her arrival. The next afternoon, Burdette died after having a heart attack.
Burdette's daughter, Karen Ayres, as administratrix of Burdette's estate, sued Dr. Hinnen and Lakeshore, alleging that Dr. Hinnen had committed medical malpractice in failing to diagnose Burdette's symptoms as a heart attack when Burdette was in the Lakeshore emergency room the night before her death. There was conflicting evidence regarding Ayres's claims, including differing interpretations of Burdette's EKG results, and those claims were submitted to a jury. The jury returned a verdict for Dr. Hinnen and Lakeshore. The trial court denied Ayres's motion for a new trial. Ayres appealed.
A jury's verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust.Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162
(Ala. 1988). In addition, a judgment based upon a jury verdict and sustained by the denial of a motion for a new trial will not be reversed unless it is plainly and palpably wrong. Ashbeev. Brock, 510 So.2d 214 (Ala. 1987). In reviewing a judgment based upon a jury verdict, this Court must review the record in a light most favorable to the appellee. Continental Cas. Ins.Co. v. McDonald, 567 So.2d 1208, 1211 (Ala. 1990). *Page 41 
Ayres first argues that the trial court erred in forbidding the cross-examination of Dr. Hinnen regarding the loss of his medical license. She maintains that, because Dr. Hinnen provided expert testimony on his own behalf concerning the standard of care he gave Burdette, his qualifications were at issue and thus warranted cross-examination pertaining to his medical license.
The record indicates that Dr. Hinnen was licensed to practice medicine in Alabama at the time he treated Burdette. His medical license was revoked approximately two years after Burdette's death, and the revocation, as Ayres acknowledges, occurred for reasons entirely unrelated to Burdette's death. As Ayres correctly argues, an expert witness may generally be cross-examined as to his or her credentials. See C. Gamble,McElroy's Alabama Evidence § 142.01(5) (5th ed. 1996). However, the trial judge has substantial discretion as to the questions a party is allowed to ask of an expert witness. The scope and extent of cross-examination is vested in the trial court's sound discretion, and this Court will not reverse on the basis of the trial court's rulings regarding cross-examination unless an abuse of discretion has occurred. See General Electric Co.v. Mack, 375 So.2d 452 (Ala. 1979).
The trial court determined that the evidence regarding Dr. Hinnen's medical license, which was revoked partly because of Dr. Hinnen's improper sexual activity with patients, would be unduly prejudicial to the jury and had no probative value because of its lack of relationship to the alleged malpractice against Burdette. A trial court may exclude evidence, even when it is relevant, if it would serve little or no purpose other than to arouse prejudice in the jury. See C. Gamble,McElroy's Alabama Evidence § 21.01(4) (5th ed. 1996). Because this evidence did not tend to prove any fact of consequence in this action and because of its obvious potential for prejudice, we conclude that the trial court did not err in excluding it.
Ayres next contends that the trial court erred in its charge to the jury concerning her wrongful death claim, because, she contends, the charge ignored deterrence as a purpose for the punitive damages awarded for wrongful death. She claims that the charge instructed the jury to calculate damages solely on the basis of punishment, rather than to deter such acts in the future.
This Court has held that a jury charge on wrongful death is "faulty" if it tells the jury of the punitive purpose of wrongful death damages without acknowledging the deterrent purpose of those damages; see Sawyer v. Stabler, 279 Ala. 496,187 So.2d 251 (1966). Nevertheless, we find no error in the trial court's charge in this case. The trial court's charge correctly noted the punitive nature of damages available for wrongful death. In that regard, it informed the jury that the damages allowable under the Alabama Wrongful Death Act are "designed to punish a wrongdoer" and informed the jury that, if the jury was not convinced that Dr. Hinnen committed a "wrong worthy of punishment," then it must return a verdict for him. However, the trial court also noted the deterrent purpose of punitive damages, stating:
 "In a suit brought for wrongful death, omission or negligence causing death, the damages recoverable are punitive and not compensatory. The damages in this type of action are entirely punitive and imposed for the preservation of human life and as a deterrence to others to prevent similar wrongs. The amount of damages should be directly related to the act, to the amount of wrongdoing on the part of the defendants.
". . . .
 "Your verdict should not be based on sympathy, prejudice, passion or bias, but should be directly related to the culpability of the defendants and the necessity of preventing similar wrongs in the future."
(Emphasis added.) The trial court's instruction properly explained the dual purposes of punitive damages — punishment and deterrence — and therefore was not erroneous.
Ayres also argues that she was prejudiced by a juror's failure to respond to a question during voir dire examination. When voir dire began, Ayres's attorney asked the veniremember to respond to questions that applied to them personally or to "a spouse, husband or wife, children, brother or *Page 42 
sister, parents, members of the immediate family." He later asked, "Does anybody else have anybody that's worked for, past or present, or has any relationship, business relationship, with Lakeshore Community Hospital?" At this point, Juror L. responded by stating that he had worked for the hospital "15 years ago"; when questioned whether that fact would affect his ability to sit in this case, he responded in the negative. Juror L. was selected for the jury. Ayres's counsel later discovered that this juror's brother had worked full-time at Lakeshore Community Hospital in the past and, according to the brother's testimony at a hearing on the motion for a new trial, was at the time of the trial working "a couple of days every two months or sometimes four days a month" at Lakeshore. The juror's sister-in-law also had worked part-time for Lakeshore. Juror L. did not mention these facts during voir dire.
At the hearing on Ayres's motion for a new trial, Juror L. testified that at the time of the voir dire he did not know that his brother was working at Lakeshore part-time. On cross-examination at that hearing, the juror stated:
 "Q. . . . When you were asked this question about whether you worked at the hospital, did you answer that question?
"A. Yes, sir.
"Q. What did you say?
 "A. I told them I worked there back 10 or 15 years ago.
". . . .
 "Q. . . . When you were asked the question at the time of the jury selection, did you know at that time that your brother was working part-time at the hospital?
"A. No, sir.
 "Q. All right, sir. Did you want to serve on that jury?
"A. No, sir.
 "Q. If you had known that, would you have revealed — have revealed that?
"A. I would have sure told it."
Juror L. also testified at the hearing on the new trial motion that his sister-in-law had worked at Lakeshore; no further questions concerning her employment at Lakeshore were raised at the hearing. The juror further testified that his brother's working at Lakeshore did not influence his decision on this case, and the trial court stated that the juror's statement that he was not anxious to serve on the jury "certainly has the ring of truth to it."
In determining the merits of a motion for a new trial that is grounded on allegedly improper responses, or a lack of responses, by veniremembers during voir dire, the trial court must inquire as to whether the movant was probably prejudiced. If probable prejudice resulted from the veniremember's actions during voir dire, then the motion for new trial must be granted. Freeman v. Hall, 286 Ala. 161, 238 So.2d 330 (1970). In Freeman, the Court noted some of the factors that may be considered pertinent to the question of prejudice. Among those factors are "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." 286 Ala. at 167,238 So.2d at 336. The question of prejudice is a matter within the trial court's discretion. Eaton v. Horton, 565 So.2d 183
(Ala. 1990).
We conclude that the trial court did not err in denying Ayres's motion for a new trial based on Juror L.'s responses during voir dire. Although Ayres contends that Juror L. "intentionally withheld [the fact of] his brother and sister-in-law's employment with [Lakeshore]," we see no reason that the juror would withhold that information and yet state that he had previously worked for that same hospital — a statement that easily could have led to his exclusion from the jury. The trial judge apparently saw no reason either. Juror L. testified that he was not prejudiced in favor of Lakeshore in his deliberations, and the trial court was convinced that his testimony was truthful. As the Freeman Court noted, the trial court hears the questions and answers during voir dire and is in the best position to decide the question of prejudice. Like the trial court in Colbert County-Northwest Alabama HealthcareAuthority *Page 43 v. Nix, 678 So.2d 719 (Ala. 1995), the trial court here was
 "able to observe the mannerisms, inflections in voice, and other characteristics of the juro[r] whose answers were at issue — in other words, things that could reflect upon the juror[']s credibility but that are beyond this Court's inherently limited ability to review by appellate transcript."
We believe the trial court was certainly in the best position to determine whether Ayres was prejudiced by Juror L.'s failure to respond, and we find no abuse of discretion in its finding that no prejudice occurred.
The judgment is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, and BUTTS, JJ., concur.