809 So.2d 808 (2001)
The TRAVELERS INDEMNITY COMPANY OF ILLINOIS and Crawford & Company
v.
Sidney O. GRINER.
1981990 and 1992325.
Supreme Court of Alabama.
April 20, 2001.
Rehearing Denied July 13, 2001.
*809 Keith J. Pflaum and W. Perry Webb of Porterfield, Harper & Mills, P.A., Birmingham; and Michael Leo Hall of Burr & Forman, L.L.P., Birmingham, for appellants.
Stephen D. Heninger of Heninger, Burge, Vargo & Davis, L.L.P., Birmingham, for appellee.
STUART, Justice.
Sidney O. Griner was a truck driver employed by Charles G. Lawson Trucking, Inc. ("Lawson"). The Travelers Indemnity Company of Illinois ("Travelers") and Crawford & Company ("Crawford") administered the workers' compensation claims for Lawson. In August 1996, Griner sued Lawson, Travelers, and Crawford, alleging fraud, outrageous conduct, and contempt of court on the part of Travelers and Crawford related to the medical treatment he had received for an injury he had incurred on the job. A jury awarded him $300,000 in compensatory damages and $200,000 in punitive damages.
Griner injured his back in May 1990, while unloading wooden pallets. The indemnity or compensation portion of Griner's workers' compensation claim was settled by an agreement under which Griner received a $60,000 lump sum and periodic payments of $399 per month for 10 years. With regard to responsibility for payments for future medical care, the settlement stated:
"[Travelers and Crawford] shall pay the reasonably necessary future medical expenses proximately resulting from [Griner's] alleged accident."
(Griner's exhibit 2.)
Griner's injury was substantial, and it required extensive medical treatment, including spinal-fusion surgery. Griner testified that before September 14, 1993, the date of his spinal-fusion surgery, he had had no significant problems getting his medical expenses paid by Travelers and Crawford. However, after undergoing the spinal-fusion surgery, he said, Travelers and Crawford, despite the requirements of the policy and the court order, delayed payment for reasonable and necessary medical devices and treatment and often refused to pay for them.
In his lawsuit, Griner specifically claimed that the defendants had failed to authorize certain reasonably necessary medically related expenditures, including expenditures necessary to purchase a hospital bed, to purchase a whirlpool tub, and to pay for psychotherapy. The court entered summary judgment for Lawson.
Travelers and Crawford removed the lawsuit to the United States District Court for the Middle District of Alabama; that court remanded to the state court. Meanwhile, Griner and his wife had filed a Chapter 13 bankruptcy petition. Travelers and Crawford then filed a petition in the bankruptcy court to stay the state-court action and to substitute the bankruptcy *810 trustee for Griner in the state-court action. According to Travelers and Crawford, Griner, by reason of his filing the bankruptcy petition, lacked standing to pursue his damages claim. They also contended that the doctrine of judicial estoppel should bar Griner from pursuing his claims. The bankruptcy court ruled that Griner was the proper party, refused to enjoin the trial of this case, and held that the doctrine of judicial estoppel did not apply. In re Griner, 240 B.R. 432 (Bankr. S.D.Ala.1999).
At the close of the evidence in the state court, the court entered a judgment as a matter of law for Travelers and Crawford on the fraud claim, reserved the contempt issue for resolution at a later time, and submitted to the jury the claim for damages based upon the alleged outrageous conduct of Travelers and Crawford. Travelers and Crawford raised the same issues they had raised before the bankruptcy court, by way of a motion for a directed verdict. The trial court held that because the bankruptcy judge had ruled on these issues, the doctrine of res judicata foreclosed additional judicial review, and it denied the motion for a directed verdict.
The jury returned a verdict in favor of Griner, assessing $300,000 in compensatory damages and $200,000 in punitive damages. The court entered a judgment on the verdict on March 5, 1999. Travelers and Crawford moved for a judgment as a matter of law or, in the alternative, a remittitur or a new trial. The trial court never ruled on these motions; consequently, they were denied by operation of law. See Rule 59.1, Ala.R.Civ.P. Travelers and Crawford appealed.
On August 11, 2000, this Court remanded the cause for the trial court to resolve the contempt claim. The trial court did so, and in its return to remand it submitted an order holding Travelers and Crawford in contempt of court. The trial court ordered Travelers and Crawford to provide and pay for the electric hospital bed and the whirlpool tub within 60 days of the order.

I.
Travelers and Crawford contend that the trial court erred in denying their motion for a judgment as a matter of law because, they say, Griner failed to present sufficient evidence of the tort of intentional infliction of emotional distressthe tort of outrageto submit the case to the jury.
In American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980), this Court recognized this particular tort, stating:
"[W]illful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby, and we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress ... must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement [(Second) of Torts, § 46 (1965)], at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72."
394 So.2d at 365. In Garvin v. Shewbart, 442 So.2d 80 (Ala.1983), this Court held that the exclusivity provisions of the Workers' Compensation Act, §§ 25-5-11, -52, and -53, Ala.Code 1975, do not bar claims based on the tort of outrage. In Continental *811 Casualty Insurance Co. v. McDonald, 567 So.2d 1208 (Ala.1990), the Court stated that there is a threshold beyond which an insurance company's recalcitrance must go before it crosses into actionable outrageous conduct.
Griner's evidence established, and Travelers and Crawford did not disagree, that Travelers had the legal obligation to pay for and provide all reasonable and necessary medical services, including prescribed treatments, medication, devices, therapy, and equipment. Additionally, the policy's only condition required that such services be prescribed by an authorized physician. Travelers and Crawford admitted that an insurance carrier cannot arbitrarily refuse to provide any reasonable and necessary things ordered by authorized treating physicians.
An examination of the evidence in this case indicates that the trial court properly refused to direct a verdict on the tort-of-outrage claim. The evidence showed that an authorized physician had ordered a hospital bed, a whirlpool tub, and psychiatric treatment for Griner. Travelers and Crawford did not pay for these items, although they had no information indicating that they were not reasonable and necessary. Because after the back surgery Griner suffered pain that prevented him from sleeping in a regular bed and therefore had to sleep in a recliner, an authorized physician ordered a hospital bed to help Griner sleep. The whirlpool tub was authorized by a physician because Griner suffered from significant pain and swelling in his legs and feet, problems that the water therapy would help alleviate. Dr. Gerald Sweeney, one of Griner's physicians, wrote a letter to Travelers and Crawford explaining that he had prescribed a whirlpool tub because it "would allow [Griner] to reduce his medication load and significantly improve his overall health as well as relieve his lower back pain." The evidence indicated that three authorized physicians had ordered the whirlpool tub, but that it was never provided. Dr. Sweeney further testified that Griner suffered the usual depression that accompanies chronic pain. He testified that Travelers and Crawford's refusal to provide the prescribed whirlpool tub and hospital bed made Griner's depression worse. The following testimony from Dr. Sweeney was admitted at trial:
"Q. Doctor, do you have an opinion as to whether the failure to provide medications prescription medications, hot tubs, electric hospital bed, referrals to Dr. Das, Dr. Singh, do you have an opinion as to whether that would have exacerbated or made worse Sid Griner's depressive condition?
"A. I know thatI know that it did. I know that it did. I saw the change in Sid. At one stage there were so many objections by the insurance company, that you would almost get the feeling that they were being punitive to this individual, for whatever reason."
(Dr. Sweeney's deposition at pp. 59-60.)
The claims adjuster, Angela McDonald, admitted at trial that prescriptions for a hospital bed, a whirlpool tub, and psychiatric treatment had been submitted. She conceded that these items should have been provided under the terms of the policy, but that so far as she knew they were not. McDonald qualified her testimony by stating that although the hospital bed, the whirlpool tub, and the psychiatric treatment had not been authorized by Travelers and Crawford, they also had not been denied. The evidence clearly established that these items, which had been authorized by physicians, were not provided for a period of approximately five years.
Consequently, Griner remained depressed and in pain for an extended period without the medical necessities prescribed by his authorized physicians. The testimony *812 indicated that Travelers and Crawford breached their contractual obligations and that that breach caused Griner severe pain and hardship. The actions of Travelers and Crawford forced him to suffer increased pain, sleep deprivation, and clinical depression for five years, although treatment to relieve these conditions had been prescribed by authorized physicians and that treatment was covered under the policy. Travelers and Crawford repeatedly admitted at trial that they had a duty under the policy to provide these treatments.
Additionally, as evidence to support his claim of outrageous conduct, Griner referred to an effort by Travelers to secure a settlement of his claim. McDonald admitted that the first suggestion of settlement came from her:
"Q. At any rate in February [1995,] you are the one that first raised the potential for settling the future medical right?
"A. As it appears in those notes, yes, sir."
(R. 44.)
Griner testified that in September 1995, he became so frustrated and depressed that he discharged his attorney and telephoned McDonald. He offered to settle all claims for future medical treatment for $80,000 and told her that he would buy his own hospital bed and whirlpool tub. McDonald, at that time, had an estimate that the company could reasonably expect to pay $279,400 for Griner's benefits over his lifetime. When Griner asked for $80,000, she offered $5,000. Indeed, she wrote on Griner's file, "I simply chuckled and stated we're not interested in anything near that." (R. 43-44.) She called Griner back a few weeks later to see if he still wanted to settle; he replied "no." She was asked the following question and gave the following answer:
"Q. It is wrong and intolerable in our civilized society to withhold providing reasonable and necessary medical orders from authorized treating physicians knowing it would cause pain and frustration so the claimant would agree to settle his medical benefits for less than he is entitled?
"A. Yes, that is wrong."
(R. 18.)
The evidence showed that Travelers and Crawford, even though they acknowledged that they were contractually obligated to provide medical care for Griner, did withhold reasonable and necessary items ordered by authorized treating physicians, knowing that their doing so would cause Griner pain and frustration and could lead him to agree to a minimal settlement. Thus, the evidence was sufficient for the jury to find that the conduct of Travelers and Crawford was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. See Continental Cas. Ins. Co. v. McDonald, 567 So.2d at 1219.

II.
Travelers and Crawford contend that the trial court erred in denying their motion for a judgment as a matter of law because, they say, Griner lacked standing to pursue his action. According to Travelers and Crawford, because Griner filed a Chapter 13 bankruptcy petition, he was not entitled to pursue this action. Travelers and Crawford raised this issue in the bankruptcy court by filing a petition for a temporary restraining order (TRO). The bankruptcy court denied their petition for a TRO and held that Griner was the proper party. The bankruptcy court held when he filed his bankruptcy petition Griner had disclosed the evidence of this lawsuit and *813 that Griner was the proper party to pursue it. In re Griner, supra. See also Ex parte Moore, 793 So.2d 762, 765 (Ala. 2000)("A Chapter 13 debtor does not lose standing to proceed on a cause of action after a proceeding in bankruptcy is instituted, as does a debtor under Chapter 7."). A collateral attack of the bankruptcy court's order is not proper.

III.
Travelers and Crawford contend that the trial court erred in denying their motion for a judgment as a matter of law because, they say, Griner was judicially estopped from proceeding in this action. The issue of judicial estoppel was also raised in the bankruptcy court, which ruled that a Chapter 13 debtor was not in the same position as a Chapter 7 debtor and that Griner was legally entitled to pursue this case. Because Griner disclosed this lawsuit when he filed his bankruptcy petition, and because this issue has already been ruled upon, the doctrine of res judicata applies. The collateral attack is improper. See Jinright v. Paulk, 758 So.2d 553, 560 (Ala.2000)(quoting with approval the bankruptcy judge's order holding that Griner could proceed with this civil action).

IV.
Travelers and Crawford argue that the punitive-damages award should be remitted. In reviewing the jury verdict, this Court not only uses the guideposts set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), but also applies the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986):
1. Ratio of Punitive Damages to Compensatory Damages: The jury awarded $200,000 in punitive damages and $300,000 in compensatory damages. Thus, the punitive-to-compensatory ratio is 1:1.5.
2. Reprehensibility: The evidence showed a flagrant and willful disregard of the legal obligations Travelers and Crawford owed Griner. They did not deny that Griner was entitled to have them pay for the items prescribed by authorized physicians. They did not deny that this failure to honor the terms of the policy aggravated and prolonged his pain. Nor was their conduct an isolated, inadvertent event. The evidence established a pattern of conduct involving significant medical needs and an awareness of the harm that would result from the unjustified denial of these medical needs.
3. Similar Civil and Criminal Sanctions: This award is not an unusually large amount in comparison with the award of $750,000 to the plaintiff in a similar case; see Continental Cas. Ins. Co. v. McDonald, supra, at 1222.
4. Profitability of Conduct: McDonald testified that an estimate before Travelers and Crawford indicated they could reasonably expect to pay $279,400 for Griner's benefits for his lifetime. When Griner asked for $80,000, she offered $5,000 to settle the claim.
5. Financial Position of the Defendant: The record contains no evidence regarding the assets of Travelers and Crawford.
6. Costs of Litigation: The litigation has been ongoing since 1996 and has included:
a) an attempt by Travelers and Crawford to remove the cause to a federal court,
b) motions filed by Travelers and Crawford in the bankruptcy court, and
c) a trial, which began on March 2, 1999, and concluded on March 5, 1999.
*814 Considering the jury award in light of these six factors, we conclude that the award does not deny Travelers and Crawford constitutional due process as defined in BMW of North America, Inc. v. Gore.

V.
Travelers and Crawford contend that the trial court erred in holding them in contempt of court. The trial court entered the following order on remand:
"This case has been remanded to this court by the Alabama Supreme Court by an order dated August 11, 2000, requiring this court to adjudicate the plaintiffs motion for contempt which was filed during the pendency of this case at the trial court. This court heard the evidence presented at trial and, after considering the motion for contempt and arguments of counsel for all parties does hereby find the defendants in contempt of court by their refusal to provide reasonable and necessary medical needs required for this plaintiff pursuant to the workers' compensation settlement order entered on February 14, 1992. The evidence in this case established that the approved and authorized physicians for the plaintiff had prescribed the following items for the plaintiff: (1) electric home hospital bed; (2) home whirlpool/hot tub for therapy; and (3) psychological treatment for chronic pain and depression. Despite knowing of these prescriptions and having no evidence that they were not reasonable and necessary the defendants refused to provide and pay for these medical needs. The court finds and orders that this action by the defendants was in direct and knowing violation of the law of this state and the order of this court on February 14, 1992, whereby the court stated:
"`That the defendant shall pay the reasonably necessary future medical expenses proximately resulting from the plaintiff's alleged incident.'
"Therefore, having found the defendants in contempt of this court, the court hereby orders these defendants to provide and pay for the electric home hospital bed and whirlpool/hot tub within the next sixty (60) days. These materials are to be provided in a means satisfactory to the patient and his physicians in the least expensive and most reasonable means that will provide the medical needs of the plaintiff. The parties will notify the court of any obstacles or disagreements on providing the quality of these needs and/or when this order has been complied with by the defendants. The court understands that after the trial of this matter the psychological treatment has been addressed and that no further order is required on that specific issue. The court neither orders nor imposes any further penalty nor award of attorney's fees to the plaintiff as counsel for plaintiff has requested simply that these medical requirements be addressed separate from the verdict of the jury and judgment of the court rendered thereon. The court finds that these medical requirements are separate and distinct damages awarded by the jury and should have been provided under the law of this state and the order of February 14, 1992."
(R. on return to remand at pp. 1-2.)
In Ex parte Cowgill, 587 So.2d 1002 (Ala.1991), this Court held that the court, in the exercise of its equitable powers, could hold a party in contempt upon a finding that "the employer willfully and contumaciously refused to provide the expenses for the medical care." 587 So.2d at 1004. As Travelers and Crawford recognize, sanctions for contempt "should not be imposed if the employer has a valid reason to question its liability for the medical expense in dispute." (Travelers' supplemental brief to this Court at p. 3.)
*815 Travelers and Crawford admitted, through the testimony of McDonald, that the hospital bed and the whirlpool tub should have been provided under the terms of the policy. Additionally, her testimony with regard to the settlement indicates bad faith on the part of Travelers and Crawford. The record supports the trial court's finding that Travelers and Crawford did "willfully and contumaciously" refuse to provide these items. Thus, the trial court did not abuse its discretion in holding Travelers and Crawford in contempt.

Conclusion
The judgment of the trial court is affirmed.
AFFIRMED.
MOORE, C.J., and LYONS, BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
SEE, J., dissents.
SEE, Justice (dissenting).
Sidney O. Griner suffered an on-the-job injury to his back. It required surgical correction and extensive medical treatment. At the time of Griner's injury, The Travelers Indemnity Company of Illinois provided the workers' compensation coverage for Griner's employer, and Crawford & Company administered the claims for Travelers. Travelers agreed, pursuant to a settlement agreement with Griner, to pay any "reasonably necessary future medical expenses" resulting from Griner's injury. Griner ultimately sued Travelers and Crawford, alleging the tort of outrage, fraud, and contempt of court. Specifically, Griner asserted that the defendants had refused to authorize certain "reasonably necessary medical expenditures," in particular expenditures for the purchase of a hospital bed, for the purchase of a whirlpool tub, and for psychotherapy. At trial, the defendants moved for a judgment as a matter of law because, they argued, Griner had presented no evidence creating a jury question on the tort-of-outrage claim.[1] The trial court denied the motion. A jury awarded Griner $300,000 in compensatory damages and $200,000 in punitive damages.
The trial court erred in submitting Griner's outrage claim to the jury, because the evidence presented at trial was insufficient to demonstrate that the defendants' handling of his claims for insurance benefits amounted to "outrageous" conduct as defined by this Court. Because I think the trial court erred in denying the defendants' motion for a judgment as a matter of law on the tort-of-outrage claim, I would reverse the judgment for Griner. Therefore, I respectfully dissent.
This Court first recognized the tort of outrage in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1981). In that case Inmon, who had formerly been employed as a claims supervisor by American Road Service Company, sued his former employer and presented evidence establishing that he had been harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily, and terminated without justification. Inmon, 394 So.2d at 367. In recognizing the tort of outrage, this Court emphasized the extreme nature of a defendant's conduct that would be sufficient to constitute the tort, and the severity of the emotional distress that would entitle a person to recover for that tort:

*816 "The emotional distress [caused by the defendant's conduct] must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement [(Second) of Torts], at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."
Inmon, 394 So.2d at 365. This Court held that the evidence Inmon had submitted in support of his claim fell short of proving the tort of outrage because he had presented "no evidence upon which reasonable people could base the belief that the [defendant] intended to cause Inmon severe emotional distress." Id. at 367. Accordingly, this Court reversed the judgment in his favor.
In numerous decisions following Inmon, we have made it clear that a plaintiff bears an extremely heavy evidentiary burden when he undertakes to make out a case for the jury on an outrage theory. In Potts v. Hayes, 771 So.2d 462 (Ala.2000), this Court observed:
"The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment. In order to recover, a plaintiff must demonstrate that the defendant's conduct `(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'"
771 So.2d at 465 (citations omitted); see Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1044 (Ala.1993) (noting that "[t]his Court has consistently held that the tort of outrage is a very limited cause of action" and, "[a]s a consequence, this Court has held in a large majority of the outrage cases reviewed that no jury question was presented").
Only once has this Court found the tort of outrage in a workers' compensation case. In Continental Casualty Insurance Co. v. McDonald, 567 So.2d 1208 (Ala. 1990), McDonald sued his workers' compensation insurer, CNA, alleging the tort of outrage and asserting that CNA, in an attempt to minimize its liability for benefits, had tried to coerce him into settling for a small lump-sum settlement of his medical claim.[2]McDonald, 567 So.2d at 1210. The evidence demonstrated that CNA delayed payments to doctors, hospitals, and pharmacists for unreasonable lengths of time, causing, for example, hospitals to threaten collection actions against him and a pharmacy to refuse to provide *817 further pain medication. Id. The evidence indicated that CNA had failed to offer any reasonable explanation for most of these delays and that it had questioned the reasonable necessity of only a very few expenses. Id. at 1220. Further, CNA had resisted paying for a hot tub or whirlpool bath prescribed by his doctor, suggesting instead a membership in a health spa or in-home alternatives. Id. at 1214. Even when McDonald's physician wrote two letters to CNA explaining why neither of those alternatives would be acceptable, CNA refused to authorize the device. Id. at 1215. This Court held that McDonald had presented sufficient evidence for a jury to conclude that he had suffered severe emotional distress because of the manner in which CNA handled his claims for medical benefits. Id. at 1219. In so holding, the Court noted that, while "CNA had a legal right to question the reasonable necessity of the expenses," it nevertheless had "no legal right to delay payments for no good reason" and that "the jury could have found that, on occasions when CNA did assert its legal rights, it did not do so in a permissible way." Id. at 1220.
The situation in McDonald represents "the minimum threshold that a defendant must cross in order to commit outrageous conduct." State Farm Auto. Ins. Co. v. Morris, 612 So.2d 440, 443 (Ala.1993). The evidence presented in this case falls far short of this standard. Griner, unlike the plaintiff in McDonald, presented no evidence of a concerted plan on the part of the defendants to coerce him into accepting a lump-sum settlement. Moreover, the evidence of delay in this case is insufficient to conclude that Travelers and Crawford engaged in a course of conduct intended to distress Griner to the point of settlement. Rather, it appears that the defendants did not delay payments "for no good reason" and "assert[ed] [their] legal rights ... in a permissible way." McDonald, 567 So.2d at 1220.
Unlike the defendant in McDonald, the defendants in this case submitted evidence justifying the delays. Specifically, the defendants presented evidence indicating that any delay in authorizing treatment or supplies was due to numerous instances in which Griner's doctors delayed in sending, or failed to send, the requisite explanations concerning prescribed procedures. With regard to the whirlpool, the evidence indicates that, while three doctors prescribed use of a whirlpool tub, none of them stated that the suggestion by Travelers that Griner take a health-club membership or use a portable whirlpool device presented unacceptable alternatives. Also, Griner submitted to Travelers conflicting estimates as to the cost of the whirlpool therapy. Specifically, Travelers received a treatment note from Dr. Stanford Faulkner stating that Griner had found a whirlpool tub costing $650. However, a month later, Travelers received a faxed document from Griner's attorney that included a proposal to remodel Griner's home to accommodate the installation of a whirlpool tub; the total price of the proposed work was $4,576. Given the discrepancy between these two estimates, Travelers had a reasonable basis for questioning the medical necessity of an installed whirlpool tub as opposed to a portable one. The way Travelers handled Griner's claims in this case simply does not rise to the level of tortious conduct demonstrated in McDonald. Because McDonald established the minimum threshold of conduct sufficient to state a tort-of-outrage claim, the trial court erred in submitting Griner's outrage claim to the jury.
NOTES
[1] At the close of the evidence, the trial court entered a summary judgment for Travelers and Crawford on the fraud claim, reserved the contempt issue for resolution at a later time, and submitted to the jury the claim for damages based upon the tort-of-outrage claim.
[2] In McDonald, this Court wrote:

"CNA's records indicated that it closed McDonald's file in late 1981, but reopened it in 1982 when it received communications from McDonald and his doctors. The file includes a note dated May 19, 1982, stating in part, `I believe if Mr. McDonald is going to have continued problems. Will settle in BSO.' Debbie Malinak, a CNA claims specialist who had been handling McDonald's file since October 1981, testified that `BSO' stands for `benefit settlement option,' which is a structured settlement of the claim that would extinguish CNA's liability for further medical payments."
567 So.2d at 1212.
CNA delayed payment for McDonald's medical and pharmacy expenses from May 1982 until McDonald sued in 1987; therefore, the evidence indicated that CNA's actions were part of an intentional pattern of delays aimed at pressuring McDonald into accepting a settlement. Id. at 1212-14.