Drue Soti, the plaintiff below, appeals from summary judgment for the defendants, Lowe's Home Centers, Inc. ("Lowe's"), and Specialty Risk Services, Inc. ("SRS"), in his action alleging the tort of outrage and fraudulent suppression. We affirm.
 Facts and Procedural History
Lowe's is self-insured for workers' compensation purposes. SRS handles workers' compensation claims filed by employees of Lowe's, and, in turn, a firm called Bunch and Associates assists SRS in handling the medical aspect of those claims.
Soti began working at a Lowe's store in Mobile on March 23, 2000. On April 15, 2000, Soti injured his back while he was bending down to pick up a tray of plants. Soti went to the emergency room, where he was treated and released; he was referred to a physician. *Page 918 
Soti was later examined by several doctors and was eventually referred to an orthopaedic surgeon, Dr. Thomas R. Dempsey. Dr. Dempsey determined that Soti had a herniated disk in his lower back. On September 8, 2000, Dr. Dempsey performed "microdiskectomy" surgery on Soti to correct this condition. On July 13, 2001, Soti had lumbar-disk-fusion surgery at the site of the previous surgery. This surgery, also performed by Dr. Dempsey, required an incision near Soti's navel and another incision in his back. In January 2002, Soti had disk-decompression surgery to relieve the symptoms of spinal stenosis, a narrowing of the spinal canal. All three surgeries were for the treatment of Soti's on-the-job injury.
Soti visited Dr. Dempsey on numerous occasions after the third surgery. On April 17, 2002, Dr. Dempsey found Soti to be at maximum medical improvement ("MMI"), and he assigned Soti a 40% permanent partial disability to the body as a whole. On April 26, Soti's attorney approached SRS seeking a settlement of Soti's workers' compensation claim.
During a June 4, 2002, visit with Dr. Dempsey, Soti indicated that he thought he felt a hernia in the area of the incision in his abdomen. Dr. Dempsey stated in his notes that he could not "really tell" if Soti had a hernia. On June 12, 2002, Soti telephoned Dr. Dempsey's office complaining that the area around the previous incision on his abdomen was "pouching out" and causing pain. Dr. Dempsey's office sent a "referral request" to SRS, stating: "eval[.] and treat for incisional hernia."[1]
A box marked "Non Emergency" was checked, and the request sought a referral to Dr. Elden Scott.[2]
On June 18, 2002, six days after Dr. Dempsey's office sent the referral request, Yvonne Sherman, a claims adjuster for SRS, received a telephone call from Dr. Dempsey's office regarding the request. A June 18 entry in Sherman's computerized claims log, which is found in the record, states:
 "Got a call from Mr. Soti's doctor and they want to perform hernia surgery. I told them to send in the notes. I called Tara at Bunch [and Associates] and she didn't know anything about the hernia surgery. I got in the notes and Dr. Dempsey was only supposed to give the claimant restrictions. Now he notes that he is concerned about his abdomen and feels like he's developing a hernia. I called Tara and Barbara at Dr. Dempsey['s] office and told them that I would not authorize surgery for the hernia. This guy has been OOW[3] since [2000] how did he get a hernia? ? ? ? Appears he must be doing something."
The next day, June 19, Barbara Richey, the workers' compensation specialist in Dr. Dempsey's office, received a voice-mail message from Sherman denying Dr. Dempsey's request for authorization for a referral to Dr. Scott for Soti. Richey noted the denial in her files[4] and asked Dr. Dempsey to write a letter "further describing *Page 919 
the need for the hernia referral." Dr. Dempsey wrote a letter to SRS dated June 21, 2002, requesting that Soti be referred to a general surgeon because Soti "feels like he has a hernia," but Dr. Dempsey noted that it was "very difficult to tell" whether Soti indeed had a hernia and that he was an orthopaedic surgeon, not a general surgeon. Richey did not fax this letter to Sherman until July 12, 2002, over three weeks after Sherman had initially denied the referral.
On July 17, 2002, Sherman spoke with Richey on the telephone; she again refused to authorize the referral. On July 19, Sherman made the following entry in her claims log:
 "This is a compensable on the job injury. The claimant's doctor tried to get me to pay for a hernia? How could that be? The man had a back injury in [2000]. He has reached MMI and the Dr., Dr. Dempsey[,] wants to do a CT scan of the Lumbar region. I have denied any treatment for the hernia. Reserves need increasing and I will do so. Just waiting for the [permanent partial disability] amount and try and settle if possible."
On July 24, 2002, Dr. Dempsey wrote another letter to SRS requesting a referral for Soti. Two days later, on July 26, 2002, Soti sued Lowe's and SRS. Count I of the complaint asserted a workers' compensation claim, and count II asserted a tort-of-outrage claim. The trial court severed counts I and II. On November 8, 2002, the trial court ordered SRS to authorize the hernia surgery, which was performed by Dr. Daniel Lane on November 15, 2002. On January 15, 2003, the trial court held a bench trial on the workers' compensation count. On March 5, 2003, the trial court found Soti to be permanently and totally disabled.
On April 14, 2003, Soti amended his complaint to add a fraudulent-suppression count against both Lowe's and SRS. Lowe's and SRS then moved for a summary judgment. The trial court held a hearing on the summary-judgment motion, and on August 29, 2003, granted the motion as to both remaining counts. Soti appeals.
 Discussion I.
Soti argues that the trial court erred in granting Lowe's and SRS's motion for a summary judgment on his tort-of-outrage count. Specifically, Soti claims that he presented substantial evidence indicating that SRS's actions in failing to authorize the hernia surgery before the trial court ordered it to do so amounted to the tort of outrage.
The exclusivity provisions of Alabama's Workers' Compensation Act do not bar tort-of-outrage or fraud actions by employees.Lowman v. Piedmont Executive Shirt Mfg. Co., 547 So.2d 90, 95
(Ala. 1989). In order to prevail on a tort-of-outrage claim, a plaintiff is required to prove that the defendant's conduct: "`(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" Harrelson v.R.J., 882 So.2d 317, 322 (Ala. 2003) (quoting Thomas v. BSEIndus. Contractors, Inc., 624 So.2d 1041, 1043 (Ala. 1993)).
 "`Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"
Travelers Indem. Co. of Illinois v. Griner, 809 So.2d 808, 810
(Ala. 2001) (quoting *Page 920 American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala. 1980)) (citations omitted).
This Court has in the past affirmed judgments based on verdicts finding the defendant had committed the tort of outrage when an employer purposefully withheld workers' compensation medical benefits in an effort to pressure a settlement. See Griner,supra; Continental Cas. Ins. Co. v. McDonald, 567 So.2d 1208
(Ala. 1990). In Griner, an employee, Griner, sustained serious on-the-job injuries. 809 So.2d at 809. However, the employer's workers' compensation carrier and claims administrator either delayed payment or refused payment altogether for Griner's reasonable and necessary medical expenses. Specifically, funds to provide certain necessary medical devices as well as treatment for depression were denied for approximately five years. The defendants knew that they were obligated to provide those devices and treatment and knew that Griner was in pain, but continued to deny this care in an effort to pressure Griner to agree to a nominal settlement. 809 So.2d at 811-12. This Court held that the defendants' actions were sufficient to support a jury's finding that their conduct was extreme and outrageous. Id. at 812.
In McDonald, a workers' compensation carrier, CNA, delayed appropriate payments and authorization for medical services for McDonald, an injured employee. 567 So.2d at 1210. This Court has subsequently described the evidence presented in that case as follows:
 "McDonald had numerous problems with CNA's failure to authorize the most basic of claims for over five years. CNA then used the results of its failure to pay to coerce McDonald into settling with CNA for an amount much smaller than his medical needs would have required. McDonald presented evidence demonstrating that he faced severe pain every day and that CNA took advantage of his pain by ceasing to pay for his pain medication. The evidence supported the finding that CNA intentionally caused McDonald severe emotional distress and that it attempted to use that distress for its gain."
ITT Specialty Risk Servs., Inc. v. Barr, 842 So.2d 638, 645
(Ala. 2002).
Soti likens the facts of his case to Griner and McDonald.
Soti alleges that his hernia was extremely painful and life threatening. Soti further asserts that SRS knew that his hernia was painful, yet, without a reasonable basis, it refused to authorize his referral for possible surgery to correct the hernia. Moreover, Soti maintains that at the time he needed the surgery, settlement negotiations were underway on his workers' compensation claim and that SRS's refusal to treat him was an attempt to coerce a more favorable settlement. Finally, Soti alleges that SRS has engaged in a pattern and practice of denying benefits in an attempt to gain leverage in settlement negotiations.
However, the facts of this case differ dramatically from those of Griner and McDonald. In those cases, the defendants engaged in a pattern of delay or denial of numerous benefits to the claimants for over five years. SRS, however, provided extensive and continuing medical treatment for Soti for three years, including three back surgeries. The only dispute over benefits arose over the hernia surgery. As the claims log indicates, Sherman clearly did not understand how Soti's hernia was a compensable injury, because at the time treatment for the hernia was requested Soti had not been working for *Page 921 
two years.[5] Moreover, Soti filed this action only sixweeks after the first referral request was forwarded to SRS. Importantly, for over three weeks of that six-week period, Dr. Dempsey delayed sending his second referral request — the June 21, 2002, letter was not sent until July 12. Unlike the defendants in Griner and McDonald, SRS did not engage in a longstanding practice of denying or delaying Soti's benefits.
Additionally, Soti's claim that SRS knew that he was in pain when it denied the referral request is not supported by the record. Dr. Dempsey's first referral request for Soti described Soti's condition as a "Non Emergency" and did not indicate that Soti was in pain and was in need of immediate treatment. Neither did Dr. Dempsey's subsequent two letters to SRS mention that Soti was in pain. Although Soti's brief gives a thorough description of the pain he endured, as related by his physician, and the complications that could have resulted had the hernia not been repaired, there is no evidence indicating that SRS knew during the six-week period between Dr. Dempsey's first referral request and the filing of the complaint in this case that Soti was in pain or that his condition was serious.[6]
Moreover, there is no evidence indicating that SRS was attempting to use Soti's condition to pressure Soti to agree to a more favorable settlement. Soti's counsel first approached SRS with settlement overtures on April 26, 2002, shortly after Soti reached MMI. Soti places a great deal of emphasis on the July 19, 2002, notation in Sherman's claims log in which she states in part: "Just waiting for the [permanent partial disability] amount and try and settle if possible." However, even if this statement is construed in Soti's favor, it does not indicate that Sherman denied the hernia operation in an attempt to cause Soti pain; indeed, the other portion of the notation indicates that Sherman still did not understand the nature of the hernia: "The claimant's doctor tried to get me to pay for a hernia? How could that be? The man had a back injury in [2000]."[7]
Furthermore, SRS argues that it denied authorization for the hernia surgery not to force Soti to settle, but because it was not clear whether the hernia was a compensable injury. Specifically, Dr. Dempsey's June 21 letter stated that Soti "feels like he has a hernia . . . it is very difficult to tell." While the letter stated that the hernia "should be covered" by workers' compensation, it did not explain how the hernia was related to Soti's on-the-job back injury. Sherman testified at deposition that she did not authorize the referral for treatment of the hernia because there was no apparent causal link between Soti's back injury and the hernia:
 "I felt it was a nonemergency. I highly questioned this because [Lowe's] had told me Mr. Soti had moved on three occasions, which would produce a hernia if you picked something up. I *Page 922 
was highly skeptical when I — when I paid this man through June 5th, and I wanted the restrictions to get him back to work, then now we come up with a hernia. So I was very suspicious of this gentleman.
 "If the hernia was related to the back, which the back was done on 07/31/01 [sic], how could that be overlooked and then a patient says, I have a hernia? Why didn't the doctor find it? You know, that should have been routine. So, no, I really questioned it.
 "We paid for three surgeries, the man was only employed with us for two weeks, and now we're going to pay for a hernia surgery. I've got to — and it was a nonemergency. No. I was going to make sure it was related before I was going to allow a — another surgery to this man."
(Emphasis added.)
"[T]he failure to authorize a referral alone does not amount to `conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"ITT Specialty Risk Servs., 842 So.2d at 645 (quoting Inmon,394 So.2d at 365). There is no evidence in the instant case indicating that SRS refused to refer Soti to a general surgeon for treatment of the hernia in an attempt to pressure a settlement of his workers' compensation claim. Although in hindsight it appears that the hernia surgery was necessary and that the hernia was related to Soti's compensable injury, the evidence demonstrates that SRS's refusal was based on a misunderstanding. Therefore, the trial court did not err in entering a summary judgment on Soti's tort-of-outrage claim. SeeGibson v. Southern Guar. Ins. Co., 623 So.2d 1065, 1067 (Ala. 1993) (holding that where the evidence tended to show that the plaintiff's difficulties in obtaining medical care from a workers' compensation carrier were the result of ordinary delays, misunderstandings, and breakdowns in communication at least as much as it tended to show that the delays were due to any deliberate attempt to deny him medical care, summary judgment for the defendants on a claim of outrageous conduct was due to be affirmed); Farley v. CNA Ins. Co., 576 So.2d 158, 160 (Ala. 1991) (holding that the conduct of a workers' compensation carrier indicating an unsympathetic attitude toward the plaintiff, giving the plaintiff the "runaround," failing to timely pay medical bills, and not always authorizing medical treatment the plaintiff sought did not rise to the level of outrageous conduct); and Wooley v. Shewbart, 569 So.2d 712, 715
(Ala. 1990) (holding that a plaintiff's claim that her employer stopped paying workers' compensation benefits for no reason shortly before a scheduled surgery was not conduct so extreme as to support finding of the tort of outrage).[8]
 II.
Soti also contends that the trial court erred in entering a summary judgment in favor of SRS on his fraudulent-suppression count. In reviewing a summary judgment on a fraudulent-suppression *Page 923 
claim, this Court applies the following standard:
 "In cases involving an allegation of intentional tortious conduct, this Court has imposed a standard of proof higher than the `substantial-evidence' standard:
 "`[A] plaintiff, in order to go to the jury on a claim [alleging intentional tortious conduct], must make a stronger showing than that required by the "substantial evidence rule" as it applies to the establishment of jury issues in regard to tort claims generally. See Code 1975, § 12-21-12. Therefore, we hold that in regard to a fraud claim against an employer, a fellow employee, or an employer's insurer, in order to present a claim to the jury, the plaintiff must present evidence that, if accepted and believed by the jury, would qualify as clear and convincing proof of fraud.'
 "[Lowman v. Piedmont Executive Shirt Mfg. Co., 547 So.2d 90, 95 (Ala. 1989)]."
Hobbs v. Alabama Power Co., 775 So.2d 783, 787 (Ala. 2000). In order for Soti's fraudulent-suppression claim to go to a jury, he must produce sufficient evidence on each of the following elements:
 "`(1) [T]hat the defendant had a duty to disclose a material fact; (2) that the defendant concealed or failed to disclose this material fact; (3) that the defendant's concealment or failure to disclose this material fact induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered actual damage as a proximate result of being induced to act or to refrain from acting.'"
ITT Specialty Risk Servs., 842 So.2d at 646 (quoting Ex parteWalden, 785 So.2d 335, 338 (Ala. 2000)).
In ITT Specialty Risk Services, an employee, Barr, accused her employer's workers' compensation administrator, ITT, of fraudulent suppression. Barr was injured in 1992 in the line and scope of her employment; she filed a workers' compensation claim that was later settled, in part, with future medical expenses to remain open. In 1998, Barr began experiencing medical problems related to her 1992 injury. Barr's physician determined that Barr required the services of a pain-management specialist, and he sought authorization for a referral. After eight months of numerous requests by Barr and her doctor, ITT had not authorized a referral to a pain-management specialist. ITT claimed that it had an unwritten policy requiring referrals to be made by telephone by either the referring doctor or the doctor to whom the patient is referred in order to receive official authorization for the referral. ITT never informed Barr or her doctor of the unwritten policy. Additionally, there was contradictory testimony by ITT employees as to whether compliance with this policy was even required in order for a referral to be authorized.
This Court found that ITT owed Barr a duty to inform her of its procedures. 842 So.2d at 647. Barr was dependent on ITT's approval of her referral, and she could not obtain treatment for her compensable injury without it. Moreover, while ITT's unwritten policy prevented its employees from approving Barr's care, ITT never informed Barr or her doctor of this policy even after several telephone calls from Barr to check on the progress of her referral request. The record did not explain how Barr or her doctors could learn how to make a proper referral, and ITT's policy was not standard custom in the trade.
In light of the facts of that case, this Court concluded that ITT had a duty to disclose its procedures for obtaining a referral. Thus, we held that Barr had produced evidence that, if accepted by the jury, would qualify as clear and convincing *Page 924 
evidence of fraudulent suppression by ITT. 842 So.2d at 647-48.
Soti claims that the facts in his case are substantially similar to those in Barr. Specifically, Soti claims that SRS had a duty to disclose to him or to his doctor SRS's requirement that a treatment or referral be causally linked to a compensable injury and that SRS suppressed this policy. In addressing this argument, the trial court stated:
 "Plaintiff Soti argues that defendant SRS, through Sherman, suppressed (1) a requirement for plaintiff to show causation, showing that the hernia problem was a result of the worker's comp. injury, and (2) that a statement in writing from a general surgeon qualified to perform hernia surgery was necessary to establish causation. This court observes that causation is a matter of law and is not easily suppressed, especially where the opposing party has counsel, and there is surely no clear and convincing evidence of `suppression' of that requirement here. Nor is there any clear and convincing evidence of a requirement by defendant SRS that a written report from a general surgeon was required before authorization of hernia surgery. Evidence of causation obviously is required and that can be provided in written form or [oral]; apparently SRS wanted its medical manager, Bunch [and Associates], to support any recommendation for coverage and Bunch submitted a written questionnaire to Dr. Lane. Whether this process was timely is challenged by plaintiff, but the court sees no evidence of suppression of this process and fails to see the sufficient standard of evidence required, `higher than substantial evidence,' to pass this case to a jury to determine whether `clear and convincing proof of fraud' exists."
Soti has not produced evidence that, if accepted by the jury, would qualify as clear and convincing evidence of fraudulent suppression on the part of SRS. In this case, SRS did not deny a referral because of some formalistic violation of a secret, unwritten policy as was the case in Barr. Instead, SRS clearly denied the referral because of confusion related to whether and how the hernia was connected to Soti's compensable injury. Moreover, Dr. Dempsey's nurse, Richey, apparently understood that SRS was confused about the causal link between the hernia and the back injury because she asked Dr. Dempsey to write a letter "further describing the need for the hernia referral." In short, Soti did not produce sufficient evidence of fraudulent suppression.
 Conclusion
The trial court correctly entered a summary judgment in favor of Lowe's and SRS. Therefore, the summary judgment is affirmed.
AFFIRMED.
NABERS, C.J., and SEE, HARWOOD, and STUART, JJ., concur.
[1] Soti's hernia developed as a result of the July 13, 2001, disk-fusion surgery. The abdominal incision weakened the muscle wall holding Soti's intestines in the abdominal cavity. This allowed Soti's intestines to bulge through the muscle wall and create a swollen area on his abdomen almost a year after the surgery had been performed.
[2] Dr. Dempsey referred Soti to another physician because he did not perform hernia surgeries.
[3] It appears that "OOW" is an acronym for "out of work."
[4] Richey recorded the denial by noting: "[Sherman] `Denied' . . . spoke to Linda W. . . . she will have [Dr. Dempsey] dict. how related."
[5] Apparently, Sherman believed the hernia was caused by activity on Soti's part and did not understand that it was a result of the July 2001 disk-fusion surgery, which had been performed almost a year before Dr. Dempsey requested the referral for Soti.
[6] Soti's brief cites the deposition testimony of Dr. Daniel Lane as evidence of the pain he suffered. Dr. Lane first examined Soti after the complaint in this case was filed. Although SRS does not appear to dispute whether the hernia caused Soti pain, Soti visited Dr. Dempsey five times after the initial referral request, but Dr. Dempsey's notes mention a hernia only once and do not indicate that it was causing Soti pain.
[7] Sherman's reference to settlement appears to refer to settling the amount of Soti's permanent partial disability benefit, not Soti's medical compensation.
[8] Soti also argues that SRS has engaged in a pattern and practice of denying claimants necessary and appropriate medical care. As support for this assertion, Soti alleges that SRS has been sued six times for failing to provide medical benefits. Only one of those cases resulted in an appellate opinion — ITTSpecialty Risk Services v. Barr, 842 So.2d 638 (2002) (holding that the plaintiff failed to produce substantial evidence to support her tort-of-outrage claim against SRS). This Court is not inclined to hold that these accusations amount to evidence of SRS's conduct.